## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CHRIS M. STYSKAL, | ) | |
| | ) | |
| Plaintiff, | ) | 4:10CV3226 |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Chris M. Styskal (Styskal) filed an application for disability benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401, *et seq.*, in August 2007, alleging disability beginning January 1, 2006. The Social Security Administration (SSA) denied benefits initially and on reconsideration. An administrative law judge (ALJ) held a hearing on July 24, 2009. On August 27, 2009, the ALJ determined Styskal was not disabled within the meaning of the Act. The Appeals Council denied Styskal's request for review on September 20, 2010. Styskal now seeks judicial review of the ALJ's determination as it represents the final decision of the SSA Commissioner.[1]

Styskal filed a brief (Filing No. 22) in support of this administrative appeal. The Commissioner filed the administrative record (AR.) (Filing No. 11) and a brief (Filing No. 27) in opposition to Styskal's appeal for benefits. Styskal filed a brief (Filing No. 30) in reply. Styskal appeals the Commissioner's decision, asking that the decision be reversed and benefits awarded because the ALJ: (1) failed to accept treating physician James R. O'Dell's opinions as controlling or entitled to the greatest weight; (2) failed to follow or properly discredit the opinions of psychological consultants Christopher Milne, Ph.D., or Linda Schmechel, Ph.D.; (3) gave erroneous reasons for discrediting the opinions of psychological consultant John J. Curran, Ph.D.; and (4) failed to properly apply *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), when determining Styskal's credibility with regard to subjective allegations of physical and mental conditions regarding limitations, restrictions, and work-like activity. **See** Filing No. 22 - Brief p. 11-12. After reviewing the

---

[1] The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). **See** Filing No. 15.

record, the ALJ's decision, the parties' briefs, the transcript, and applicable law, the court finds the ALJ's ruling, that Styskal was not disabled, should be affirmed because it is supported by substantial evidence in the record.

## PROCEDURAL BACKGROUND

Styskal applied for SSI benefits on August 8, 2007, pursuant to the Act (AR. 116-125).  Styskal alleged an inability to engage in any substantial and gainful work activity as of January 1, 2006, due to "Lupus anti-coagulant, west nile virus, tia's, low ldl's, [and a] heart condition," all of which caused Styskal nausea, headaches, and cognitive thinking problems (AR. 67-71, 72, 118, 140).  The SSA denied benefits initially (AR. 72-75) and on reconsideration (AR. 80-88).  Upon Styskal's request, on July 29, 2009, ALJ Jan E. Dutton held a hearing (AR. 29-66, 89, 96).  During the hearing, Styskal amended the alleged onset date of his disability to December 31, 2007 (AR. 32, 400).  The ALJ issued a decision on August 27, 2009, determining Styskal has not been under a disability, as defined by the Act, from January 1, 2006, through the date of the decision (AR. 14-23).  The Appeals Council denied Styskal's request for review on September 20, 2010 (AR. 1-5).

## FACTUAL BACKGROUND

### A.    Medical Records

In 2003, Styskal sought treatment for headaches, fatigue, and joint pain (AR. 365-366).  In early 2005, Styskal also reported having contracted West Nile virus (AR. 278). In May 2005, Styskal sought additional treatment for headaches, fatigue, swelling, joint pain, and "vague neurological symptoms," including memory loss (AR. 225-234). Additionally, Styskal reported he had experienced deep venous thrombosis during a bout of pneumonia in 1986, after which he experienced self-reported transient ischemic attacks (TIAs) for several years, with a significant episode in November 2004, resulting in temporary paralysis (AR. 225-234).  At that time in 2005, Styskal was diagnosed with antiphospholipid antibody syndrome (APS) and systemic lupus erythematosus (SLE) (AR. 225-234).  In 2006, Styskal reported he had indolent Lyme disease, as did the other members of his family (AR. 217, 267).  During this time period and into 2007, Styskal also underwent treatment for high cholesterol and depression (AR. 216, 233, 258-259).

On August 14, 2006, Styskal reported for a follow-up appointment for APS and SLE to James R. O'Dell, M.D. (Dr. O'Dell), a physician at the Nebraska Medical Center's Rheumatology Clinic (AR. 217-218). Styskal stated he was doing very well and was "very active" with no problems (AR. 217). Styskal rated his pain and fatigue as a two on a ten-point scale with ten being the worst (AR. 217). Styskal reported generalized aches and pains, but stated he had no swelling (AR. 217). Similarly, examination revealed no swelling or tenderness in his joints (AR. 217-218). Dr. O'Dell counseled Styskal about Lyme disease, its proper diagnosis and treatment (AR. 218). Dr. O'Dell opined Styskal's symptoms were not consistent with Lyme disease and "emphasized" the importance of Styskal's use of his prescribed medications for APS and SLE symptoms due to Styskal's decrease of those medication during his course of treatment for Lyme disease (AR. 217-218).

During a follow-up visit with Dr. O'Dell in February 2007, Styskal reported he was doing quite well with no complaints (AR. 254). Styskal stated he had pain, rated as a six on a ten-point pain scale, but could not identify from where his pain was originating (AR. 254). Styskal rated his fatigue as a two (AR. 254). Dr. O'Dell noted Styskal stopped taking his cholesterol medication "sometime ago for unknown reasons" and counseled Styskal about the importance of lowering his cholesterol in light of his APS and SLE (AR. 254-255). Dr. O'Dell wrote: "We have tried to explain this to [Styskal] but was [sic] unsure of whether or not he understands the true importance of this" (AR. 255).

On September 14, 2007, Robert R. Sundell, M.D. (Dr. Sundell), performed a neurological examination of Styskal based on symptoms including headaches, fatigue, poor memory, and episodes of right side numbness and facial tingling (AR. 362). Dr. Sundell opined that Styskal's reported depression may be contributing to the "overall situation" (AR. 362). The examination revealed stable gait; symmetric strength and reflexes; intact fine motor skills; and a negative sensory examination (AR. 363). Dr. Sundell recommended anti-depressant treatment and formal neuropsychometric testing (AR. 362). However, Dr. Sundell confirmed, "presently I do not find any definite new focal abnormalities to support a primary neurological cause for these symptoms" (AR. 362). Although an October 2, 2007, magnetic resonance imaging (MRI) scan of Styskal's brain was abnormal, no pathology was identified (AR. 311). Later that month, Dr. Sundell noted

3

that Styskal seemed stable from a neurological standpoint, but that his affect appeared mildly depressed (AR. 373).   Dr. Sundell again recommended Styskal try using an antidepressant "that might help his cognitive symptoms" (AR. 373).

In September 2007, Styskal and his wife filled out questionnaires describing Styskal's daily activities and symptoms (AR. 149-156).  The answers indicate an increase in negative symptoms and a decrease in activity.  Mrs. Styskal wrote, "while he has had ups and downs since his lupus diagnosis, overall he is declining . . . when home, he spends most of his time resting" (AR. 151).  Additionally, Mrs. Styskal noted Styskal "does groom himself well" (AR. 150).   Styskal describes his activities including doing some laundry, driving the riding lawn mower and cleaning the garage (AR. 152).  Styskal wrote that he had good days forty percent of the time with a four to five "intensity level" for symptoms and bad days were an eight to nine intensity level; however the "good days seem to be getting less" (AR. 154).

Styskal received primary healthcare services from Luke P. Lemke, M.D. (Dr. Lemke), at the Columbus Medical Center, during all relevant time periods (AR. 257-304, 317-323, 354-356, 458-464, 515-519).  In October 2007, Dr. Lemke noted Styskal received continuing treatment for a chronic condition of APS and recurrent stroke-like symptoms (AR. 318).  Dr. Lemke wrote that he "had a long discussion [with Styskal] about the possibility of starting medications for . . . cholesterol" (AR. 318).  However, Styskal "is not very excited about that . . . he is trying to quit smoking" (AR. 318).

On November 19, 2007, Styskal underwent a consultative psychological evaluation with John J. Curran, Ph.D. (Dr. Curran) (AR. 324-334).  Dr. Curran noted Styskal walked with an upright posture and a steady gait, and "[t]here were no apparent physical disorders" (AR. 324).  Styskal had not previously seen a psychiatrist or been a patient in a psychiatric hospital (AR. 327).  Styskal reported taking St. John's wort for depression (AR. 327). Styskal reported daily struggles with fatigue, mental problems, such as poor concentration, and increased depression (AR. 328-329).  Styskal stated he was not sleeping well (AR. 329). Styskal's verbal, performance, and full-scale intelligence quotient (IQ) scores placed him in the average to high average range (AR. 330).   Dr. Curran diagnosed cognitive disorder, not otherwise specified (NOS); depressive disorder, NOS, mild; and nicotine dependence (AR. 332).  Dr. Curran assessed Styskal with a Global Assessment of

4

Functioning (GAF) Scale score of 45[2] (AR. 332).  However, Dr. Curran specifically noted Styskal "has never a thought of suicide" and does not appear to have difficulties in maintaining social functioning (AR. 329, 331).  Dr. Curran noted Styskal reported he had been working only a few hours each day, making mistakes at work, which he had not made in the past and had cost his company income (AR. 328, 334).  Dr. Curran opined Styskal was capable of understanding and remembering short and simple instructions (AR. 334).  However, because Styskal's mental abilities changed from day to day and on some days he needed more reminders of his duties and took longer to complete them, Dr. Curran opined Styskal was not able to sustain concentration and attention for task completion and Styskal could not carry out short and simple instructions under ordinary supervision (AR. 334).  Dr. Curran opined Styskal does have the ability to adapt to changes in his environment (AR. 334).

On December 4, 2007, Christopher Milne, Ph.D. (Dr. Milne) completed a Mental Residual Functional Capacity Assessment (AR. 335-338) and a Psychiatric Review Technique form with a narrative appraisal of Styskal (AR. 339-352).  Dr. Milne reviewed Styskal's records and determined that although Styskal's condition is severe, it is not consistent with any claim of marked psychological limitations (AR. 351).  Specifically, Dr. Milne concluded Styskal suffered only moderate limitations in the ability to maintain concentration; understand and carry out detailed instructions; respond appropriately to changes in the work setting; perform activities within a schedule and maintain regular attendance; and to handle more detailed work routines (AR. 335-336, 349, 351).  Moreover, Dr. Milne determined Styskal has no restrictions of activities of daily living, no difficulties in maintaining social functioning, and no episodes of decompensation (AR. 349).

On December 11, 2007, T. Scott Diesing, M.D. (Dr. Diesing), examined Styskal to provide a neurological consultation and "second opinion regarding TIA's, lupus, headaches, fatigue, and cognitive symptoms" (AR. 357-360).  Styskal reported his

---

[2]  The Global Assessment of Functioning (GAF) is a clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. **See** American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 30-32 (4th ed. text rev. 2000) (DSM-IV-TR).  A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  **See** DSM-IV-TR at 34.

concerns about "progressively deteriorating cognition over the last few years[,] . . . his memory is bad[,] . . . [h]e has a poor conception of length of time[, h]e has trouble with prioritization and decision making and often makes poor decisions" (AR. 358). Styskal "admits some depression but will not start any medications until after he quits smoking" (AR. 358). Styskal reported he was sleeping "okay" (AR. 358). Dr. Diesing concluded Styskal's neurological examination was "essentially normal" (AR. 359). Dr. Diesing opined Styskal's condition was consistent with APS secondary to SLE (AR. 359). Further, Dr. Diesing opined Styskal's reported TIAs were, in fact, migraine with aura and acephalgic migraine headaches and noted Styskal also suffered mixed tension headaches in the evenings (AR. 359). Dr. Diesing concluded Styskal had a cognitive syndrome with neuropsychiatric symptoms likely secondary to lupus (AR. 359). Dr. Diesing doubted Styskal ever had either West Nile virus or Lyme's disease (AR. 359). Dr. Diesing stressed Styskal "needs to quit smoking" and control his cholesterol to decrease his vascular risk factors (AR. 359).

Styskal followed up with the Rheumatology Clinic the following day (AR. 371-372). Styskal reported daily headaches unrelieved by Darvocet and lasting two to four hours (AR. 371). Styskal also reported neck, shoulder, and elbow pain, he felt his memory was getting worse, and he had difficulty dressing and washing himself (AR. 371). Styskal rated his pain as an eight out of ten and his fatigue as a seven out of ten, but reported he "has been doing fair lately" (AR. 371). Dr. O'Dell observed Styskal had no joint activity or any other organ systems involved, with respect to his SLE (AR. 372). Dr. O'Dell made no changes in medication, but recommended Styskal begin using cholesterol medication (AR. 372). Styskal was taking Coumadin, Plaquenil, Niacin, Aspirin, Chantix for smoking cessation, and cod liver oil (AR. 372). Dr. O'Dell planned to continue to monitor Styskal, after additional neuropsychiatric testing was completed, in the normal course of a six-month follow-up appointment (AR. 372).

In January 2008, Styskal underwent a neuropsychological consultation with Angela C. Gleason, Ph.D. (Dr. Gleason) (AR. 523-527). Despite weaknesses in certain areas such as problem-solving and sustained attention, Dr. Gleason estimated Styskal's cognitive intellectual abilities to be in the above average to superior range, and his IQ scores were all above 100 (AR. 524-525). Dr. Gleason opined that Styskal's difficulties may result in

6

vocational limitations and would likely cause him problems performing the multiple functions required to own and manage one's own business (AR. 527). Dr. Gleason wrote: "Styskal would likely perform best in a structured environment that minimizes the effects of his reduced concentration and capacity to multi-task, as well as difficulties with self-monitoring and attention to detail" (AR. 527). Dr. Gleason was unable to give specific recommendations because Styskal failed to make a follow-up appointment to discuss the test results and implications for daily function (AR. 527).

On March 18, 2008, Dr. O'Dell completed a Lupus Physical Capacity Evaluation form (AR. 401-406). Dr. O'Dell wrote, "It is important to note that physical limitations are not really the issue here, it is his mental cognitive function after his stroke that is" (AR. 406). Additionally, Dr. O'Dell stated Styskal could frequently lift and carry up to twenty pounds in a competitive work situation and could sit for about four hours in an eight-hour workday, and stand/walk for the same amount of time (AR. 404). Dr. O'Dell further opined that, as a result of his impairments or treatment, Styskal was likely to be absent from work more than three times per month, and indicated that the maximum total workday for Styskal was six hours (AR. 405). Dr. O'Dell concluded Styskal would occasionally need to work at a slow pace and would only be able to work up to three days per week (AR. 406). Dr. O'Dell checked boxes on the form indicating Styskal suffered "severe fatigue" and "severe malaise" (AR. 402). Finally, Dr. O'Dell determined Styskal would "constantly" experience symptoms severe enough to interfere with his attention and concentration and could only tolerate a low stress job due to "significant cognitive impairment and memory problems secondary to SLE and [APS] as well as his stroke" (AR. 403).

On March 23, 2008, Linda Schmechel, Ph.D. (Dr. Schechel) completed a Mental Residual Functional Capacity Assessment (AR. 411-413) and a Psychiatric Review Technique form with a narrative appraisal of Styskal (AR. 416-429). Dr. Schmechel reviewed Styskal's records and determined Styskal's mental condition imposes moderate, but not marked psychological limitations (AR. 428). Specifically, Dr. Schmechel concluded Styskal suffered only moderate limitations in the ability to maintain concentration; understand and carry out detailed instructions; remember locations and work-like procedures; and complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods (AR. 411-412, 426). Dr. Schmechel identified there was no evidence in the record to suggest a limitation in Styskal's ability to respond appropriately to changes in the work setting (AR. 412). Moreover, Dr. Schmechel determined Styskal has mild restrictions of activities of daily living, no difficulties in maintaining social functioning, and no episodes of decompensation (AR. 426). Dr. Schmechel notes Styskal indicated it is the physical symptoms which prevent him from working full-time and there is no evidence in the record of marked limitations of cognition or memory other than Styskal's general subjective reporting (AR. 428). Dr. Schmechel also notes Styskal has a strong average IQ, is trusted to care for his children alone, drives independently, and needs no extra supervision to maintain personal safety or complete activities of daily living (AR. 428).

Styskal visited the Nebraska Pain Consultants pain clinic on April 17, 2008, for joint pain (AR. 505-510). Styskal described his pain as aching, constant, throbbing, and worse with movement or lying still, but better with frequent position changes, medication, and using a hot tub (AR. 505). Styskal rated his pain as fluctuating between a four and an eight on a ten-point scale and rated the pain a six during the examination (AR. 505). Styskal stated the pain had worsened over the last six months and caused him depression (AR. 505, 509). Styskal reported the pain did not improve with physical therapy or acupuncture, but did improve with use of prescribed opioid medications and NSAIDS (AR. 505). Physical examination results were mostly normal, although Styskal had tenderness along his paraspinous muscles and discomfort with flexion of the cervical spine (AR. 507-508). The clinician prescribed two non-opioid pain relievers, Cymbalta and Celebrex, and discussed the importance of increased functional restoration with Styskal, such as aqua therapy and land physical therapy (AR. 509).

On June 10, 2008, Styskal returned for a neurologic follow-up with Dr. Diesing (AR. 445-446). Dr. Diesing wrote: "Neurological examination today is unchanged and essentially normal" (AR. 445). Styskal reported his cognitive function continued unchanged in that he was experiencing "trouble focusing and with short term memory" (AR. 445). Motor examination was normal, as were bulk, tone, and coordination (AR. 445). Dr. Diesing's impression was Styskal "[wa]s neurologically stable although it sounds as though his headaches have improved" (AR. 445). Styskal reported his headaches occurred once

or twice each week, which was an improvement from daily headaches (AR. 445). Styskal reported his mood was "okay," although his wife disagreed (AR. 445). Dr. Diesing noted "[Styskal] is reluctant to pursue [Zoloft]. He has not initiated any migraine preventive medications or psychiatric follow-up. He continues on Coumadin, Plaquenil, aspirin, B6, and cod liver oil. He takes occasional Midrin" (AR. 445). Dr. Diesing recommended an "aggressive treatment of depression" and prescribed Celexa to help with headaches and benefit "any potential depression, apathy, or frontal lobe syndrome whether organic or psychiatric" (AR. 446, 447).

Styskal followed up with Tahar Mahmoudi, M.D. (Dr. Mahmoudi), at the Rheumatology Clinic on June 11, 2008 (AR. 471-472). Styskal reported joint pain, worse with physical activity, and skin photosensitivity (AR. 471. Dr. Mahmoudi noted the joint pain seemed to be stable since Styskal's prior visits (AR. 471). Styskal stated his headaches were somewhat improving by decreasing to three or four each week (AR. 471). Styskal's memory loss was stable since his last visit (AR. 471). Dr. Mahmoudi recommended medication to aggressively control cholesterol levels, however noted Styskal declined medication because he planned to try diet and exercise to lower his LDL (AR. 471). Dr. Mahmoudi opined Styskal had no joint activity or organ system involvement with his SLE (AR. 471).

In September 2008, Jake DeNell, a physical therapist, conducted a disability evaluation of Styskal (AR. 449-456). Mr. DeNell observed that Styskal appeared motivated and made good effort without inappropriate pain behaviors throughout the test (AR. 452). Mr. DeNell's examination revealed no warmth or obvious swelling in Styskal's joints; full arm and leg strength; and full range of motion in Styskal's cervical spine (AR. 451). Styskal was able to bend over and touch the floor with his knees extended on multiple occasions, and demonstrated normal backward bending and side gliding movements (AR. 451). Mr. DeNell opined Styskal could sit constantly throughout a workday if allowed to change positions periodically to decrease pain caused by static sitting (AR. 454). Mr. DeNell recommended Styskal limit standing and walking to four to six hours, in thirty-minute increments, in an eight-hour workday (AR. 454). Mr. DeNell indicated that Styskal should be kept to light work and recommended that Styskal continue to work (AR. 455).

Mr. DeNell wrote: "The client appears to be in an ideal work situation, in that he's able to self pace his work being part owner in a self employed business" (AR. 455).

On October 15, 2008, Styskal saw Dr. Lemke for an annual health examination (AR. 458-459). Styskal reported his headaches were better since he started using Celexa (AR. 458). Styskal also reported feeling "reasonably well" and "no better, no worse" (AR. 458). Styskal did not do any ongoing stretching exercises for his continued back pain and reported he had no cognitive changes (AR. 458). Dr. Lemke noted "regular back stretching exercises are once again outline for the patient" (AR. 458). Additionally, Dr. Lemke prescribed Crestor to help control cholesterol because Styskal's LDL was 175 (AR. 458).

On December 9, 2008, Styskal had a follow-up appointment with Dr. Diesing (AR. 513-514). Styskal reported experiencing headaches at a frequency of once each week, which is an improvement, "[h]is thinking he feels is better and his concentration and memory are a bit better" (AR. 513). Styskal indicated his neck and back pain were unchanged and caused him to have poor sleep (AR. 513). Physical examination was normal, and Styskal had no paraspinal muscle tenderness (AR. 513). Dr. Diesing noted Styskal had a stable neurological examination, and medication changes or follow-up appointments were unnecessary unless he were to experience new problems (AR. 514).

On December 10, 2008, Styskal reported for a follow-up examination in the Cardiology Clinic with Eric Williams, M.D. (Dr. Williams) (AR. 468-469). Styskal denied chest pain, but admitted he still smoked cigarettes and exercised only sporadically (AR. 468). Styskal's total cholesterol was 248 with an LDL of 192 (AR. 468). Dr. Williams did "spend quite a bit of time in clinic today discussing the dangers of his combination smoking plus high inflammatory state plus marked elevated low density lipoprotein" (AR. 468). Styskal indicated he had been counseled about that before, but would now "consider" starting cholesterol medication (AR. 468).

When Styskal saw Dr. O'Dell on December 10, 2008, Styskal reported that he felt the same since his last visit, in June, and that he had pain in his neck, wrist, back, and hands (AR. 466-467). Styskal described the neck and back pain as constant with occasional flaring of increased pain and stiffness (AR. 466). Styskal said his migraines had decreased in frequency to one each week (AR. 466). Styskal confirmed he had no chest

pain (AR. 466).  As before, Dr. O'Dell noted Styskal had no joint activity or any organ system involved in his SLE (AR. 466).

Styskal returned to the Rheumatology Clinic in June 2009, at which time he reported some back and neck pain as well as stiffness (AR. 520).  Styskal reported he had stopped smoking after his hospitalization for pneumonia, the previous month, but was currently smoking one package of cigarettes each day (AR. 520).  Styskal reported having about one migraine each month and that his illness affects him at a five, he rated his pain as a seven and his level of fatigue at a six (AR. 520).  Physical examination revealed mild tenderness to palpation in his finger joints, as well as some tenderness in his right wrist with flexion, but was otherwise normal (AR. 520-521).  Styskal was taking Coumadin, Plaquenil, Aspirin, Simvastatin, Celexa, Midrin as needed for headaches, and vitamins (AR. 372).  No medication changes were made (AR. 521).  The attending physician wrote:  "Again, we encouraged the patient to try to quit smoking to optimize his vascular health as well as for other benefits of quitting smoking.  He appears to be in the precontemplative phase of change at this time" (AR. 521).

In response to a letter from Styskal's counsel dated June 17, 2009, Dr. O'Dell stated that his March 18, 2008, answers to the Lupus Physical Capacity Evaluation had not changed (AR. 511).  He further wrote that Styskal "[wa]s stable but not improved" (AR. 511).

## B.    Administrative Hearing

During the July 24, 2009, administrative hearing, Styskal testified he was part owner of a satellite television equipment and services company (AR. 33-34).  Several years prior to the hearing, Styskal was involved in all aspects of the business including installation of satellites, business development, and direct customer sales (AR. 40-41).   Over time Styskal's partner has taken over the cellular portion of the business and Styskal hired a manager to relieve himself of most of his duties (AR. 41).  As of the hearing date, Styskal continued to work on a part-time basis doing mostly administrative tasks (AR. 33-34).  He explained he tries to go in to work three or four times each week, and work from fifteen minutes to three hours each of those days (AR. 33-34).  The administrative tasks include preparing commissions and advertising, and ordering inventory (AR. 34, 36-37).  Styskal

uses a computer to complete these tasks and does no lifting or carrying (AR. 34). Styskal makes the twenty-minute drive to the office by himself and does no work from home (AR. 34). Styskal typically works during the middle of the day (AR. 36). Styskal described his physical and mental fatigue that prevent him from working full-time (AR. 35). The mental fatigue causes him to make mistakes due to lack of concentration (AR. 39). Styskal also experiences fatigue and poor vision after working on a computer for twenty to thirty minutes, at which time he must rest his eyes for several minutes (AR. 36). Similarly, after sitting for twenty to thirty minutes, Styskal must stand and stretch for five to ten minutes due to back and neck pain (AR. 43).

After working, Styskal returns home to nap or rest for an hour (AR. 46). Styskal sleeps only three to fours hours at a time during the night due to neck, back, and stomach pain (AR. 35). Styskal takes no prescription sleep aid (AR. 36). Styskal testified he also suffers from migraines and "moderately constant" joint and muscle pain in his hands, wrists, ankles, elbows, shoulders, and neck (AR. 37-39). Styskal suffers symptoms everyday but also has "flare-ups . . . where [he] need[s] to take pain pills" (AR. 37, 41-42). Styskal described his headaches and neck and back pain as getting more severe over time, but he tries not to take medication if he does not plan to be active (AR. 37-38). Medication was helping with migraine headaches until two recent episodes (AR. 38). Styskal described his heart condition as flaring up once or twice a month (AR. 38-39). He feels a heavy pain in his chest with shooting pains throughout the left side of his chest (AR. 38-39). The chest pain resolves within twenty minutes when Styskal rests and drinks water (AR. 38). Styskal stated he can only stand for five or ten minutes before having back pain and weakness (AR. 42-43). Styskal testified he experiences frustration and depression due to the mistakes he is making at work and not being able to play with his children who are ages two and six (AR. 39, 41, 46). Styskal said he was not, at the time of the hearing, seeing a mental healthcare professional, but he was taking anti-depressant medication (AR. 47, 55). He was also taking Midrin for migraine symptoms and Darvocet for pain (AR. 47). Styskal said his doctors had not recommended surgery for his back pain, and that while he had attended physical therapy sessions about two decades earlier following an automobile accident, he was not currently undergoing physical therapy for his pain (AR.

56).  He said his wife did not work, and his business was experiencing a slow down (AR. 56-57).

Randi Langford-Hetrick, the vocational expert (VE), testified at the administrative hearing (AR. 58-65, 113).  The ALJ posed a hypothetical question that reflected Styskal's age, education, and work experience with limitations including being able to perform only simple, routine tasks (AR. 59-60).  The VE determined the hypothetical individual could not return to Styskal's previous work, but could perform medium unskilled work (AR. 60).  The ALJ asked a second hypothetical also limiting the individual to only occasional bending, twisting, stooping, crouching, squatting, kneeling, and crawling, with infrequent stair or ladder climbing (AR. 60).  The VE further limited the individual to light work, which would include light housekeeping, sales attendant, and light packing jobs (AR. 61).  Finally, the ALJ posed a hypothetical including the following limitations: carrying up to twenty pounds occasionally or ten pounds frequently, and standing and walking for four hours in an eight-hour day, and sittin for four hours in an eight-hour day (AR. 61).  The third hypothetical also included a limitation of having to work at a slow pace and be absent more than three times each month (AR. 62).  Based on her experience, the VE testified that the third hypothetical person could not perform any jobs in the economy (AR. 62).  The ALJ and Styskal's attorney asked the VE additional questions limiting the first hypothetical to someone with certain mental impairments, such as the ability to understand and carry out simple instructions (AR. 63-65).  The record before the court does not contain the VE's responses, which were inaudible, but these responses are immaterial to the resolution of this appeal (AR. 64-65).

### THE ALJ'S DECISION

The ALJ concluded Styskal was not disabled under the Act and was not entitled to any disability benefits (AR. 14).  The ALJ framed the issue as whether Styskal was eligible for benefits as a disabled individual under the Act (AR. 14).  As noted by the ALJ, the Act defines "disability" as an inability to engage in any substantial gainful activity due to physical or mental impairments (AR. 14-15).  **See** 42 U.S.C. § 423(d)(1)(A) (2004); 20 C.F.R. § 404.1505(a) (2006).  These impairments must be expected to result in death or must last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A).  With

respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met (AR. 14).  The ALJ determined Styskal meets the insured status requirements (AR. 14, 16).

The ALJ must evaluate a disability claim according to the sequential five-step analysis prescribed by the Social Security regulations.  **See** 20 C.F.R. § 404.1520(a)-(f); **_Jones v. Astrue_**, 619 F.3d 963, 968 (8th Cir. 2010).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

**_Goff v. Barnhart_**, 421 F.3d 785, 790 (8th Cir. 2005) (citation omitted); **see _Kluesner v. Astrue_**, 607 F.3d 533, 536 (8th Cir. 2010).  More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience.  **See** 20 C.F.R. § 404.1520(a).  If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience.  If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy.  A claimant's residual functional capacity is a medical question.

**_Singh v. Apfel_**, 222 F.3d 448, 451 (8th Cir. 2000) (internal citations omitted).  "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled."  **_Pelkey v. Barnhart_**, 433 F.3d 575, 577 (8th Cir. 2006) (citation omitted); **see _Kluesner_**, 607 F.3d at 536.

In this case, the ALJ followed the appropriate sequential analysis.  At step one, the ALJ found Styskal had engaged in some work activity and his earnings for 2006 and 2007

were above presumptive substantial gainful activity levels for those years, however the 2008 and 2009 earnings were, or were projected to be, lower (AR. 16).  Therefore, the ALJ declined to reach a disability decision at step one (AR. 16).

At step two, the ALJ found Styskal has "severe impairments:  antiphospholipid antibody syndrome secondary to systemic lupus erythematosus, and; cognitive disorder secondary to lupus" (AR. 16).  The ALJ specifically determined Styskal does not suffer a severe spine impairment or have a qualifying medically determinable cardiovascular impairment (AR. 16).  At step three, the ALJ determined Styskal does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments, including systemic lupus erythematosus, in 20 C.F.R. Part 404, Subpart 4, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526) (AR. 16).

Nevertheless, the ALJ found Styskal's ability to perform work-related functions, or a residual functional capacity (RFC), is limited such that Styskal could only

> lift and carry 20 pounds occasionally and 10 pounds frequently, he can stand and walk six hours out of an eight hour workday, he can sit six hours out of an eight hour workday, he should avoid concentrated exposure to wet environments, and he is limited to jobs involving simple, routine tasks

(AR. 18).  The ALJ did not find Styskal's testimony credible to the extent Styskal attempted to establish total disability (AR. 19).  The ALJ noted that some of the treatment notes are inconsistent with Styskal's alleged symptoms (AR. 19).  Specifically, the ALJ compared Styskal's testimony with Dr. Diesing's notes indicating Styskal was stable, had a normal mental status, coordination, and reflexes, and pain was resolving (AR. 19).  Additionally, the ALJ relied upon Dr. O'Dell's statement explaining Styskal's physical limitations were not the issue, instead cognitive function caused his impairments, and Dr. Gleason's assessment that Styskal showed "above average to superior" reasoning skills, had excellent short focused concentration, and IQ scores above 100 (AR. 19-20).  The ALJ specifically credited Dr. Diesing's analyses, Mr. DeNell's assessment, and discounted the opinions of Dr. O'Dell, Dr. Curran, Dr. Gleason, and the state agency assessments (AR. 20).

Next, the ALJ assessed Styskal's job history and potential employability.  At step four, the ALJ determined Styskal could not perform any past relevant work (20 C.F.R. § 404.1565), because although Styskal is still working at his job, he is limited to more simple repetitive tasks than he could do as an installer, manager, and sales representative (AR. 21-22).  At step five, the ALJ relied upon the testimony of the VE, finding a person of Styskal's age, education, and RFC could perform a limited amount of light exertional-level work in various occupations that exist in the regional and national economies in significant numbers (AR. 22-23).  The ALJ determined that because Styskal retained the RFC for such unskilled light labor, he was not disabled under the Act or entitled to disability benefits (AR. 23).

Styskal sought review of the ALJ's decision by the Appeals Council.  On September 20, 2010, the Appeals Council denied the request for review, but noted it had considered additional evidence, specifically a four-page brief submitted by Styskal's representative attorney (AR. 1-10).

Styskal appeals the Commissioner's determination on four grounds.  First, Styskal argues the ALJ failed to accept treating physician Dr. O'Dell's opinions as entitled to the greatest weight.  **See** Filing No. 22 - Brief p. 11-12.  Second, Styskal argues the ALJ failed to follow or properly discredit the opinions of psychological consultants Dr. Milne and Dr. Schmechel.  **Id.**  Similarly, Styskal argues the ALJ gave erroneous reasons for discrediting the opinions of psychological consultant Dr. Curran.  **Id.**  Finally, Styskal contends the ALJ improperly discounted Styskal's credibility.  **Id.**  The court will address each issue below.

## STANDARD OF REVIEW

A district court is given jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g).  A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole."  *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011).  Substantial evidence is defined as less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.  *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010); **see also** *Minor v. Astrue*, 574 F.3d 625, 627 (8th Cir. 2009) (noting "the 'substantial evidence on the record

as a whole' standard requires a more rigorous review of the record than does the 'substantial evidence' standard"). "If substantial evidence supports the decision, then [the court] may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (alteration added). "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error." *Nettles v. Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983). The court reviews questions of law de novo. **See** *Miles v. Barnhart*, 374 F.3d 694, 698 (8th Cir. 2004). Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole. **See** *Nettles*, 714 F.2d 835; *Renfrow v. Astrue*, 496 F.3d 918, 920 (8th Cir. 2007). Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578 (**quoting** *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (alteration added)).

## DISCUSSION

### A.    Treating Physician Dr. O'Dell's Medical Opinion

Styskal contends the ALJ failed to accept as controlling the limitations and restrictions placed upon Styskal by his rheumatologist of nearly three years, Dr. O'Dell. **See** Filing No. 22 - Brief p. 11. Styskal argues the ALJ did not detail all of Dr. O'Dell's opinions, but rather focused only on the opinions that would limit Styskal to six hours per day and more than three absences from work per month. *Id.* at 17. Styskal asserts the ALJ incorrectly ignored Dr. O'Dell's remaining opinions.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). Although the requirement of severity is not an "onerous requirement," neither is it a "toothless standard." *Id.* at 708. An "impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 708 (**citing** *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)) (noting "the impairment would have no more than a minimal effect on the claimant's ability to work"); **see** 20 C.F.R. § 404.1521(a). When considering the severity

of mental impairments, the ALJ should consider four functional areas: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). When the degree of limitation in the first three functional areas are rated as "none" or "mild" and "none" in the fourth area, the Commissioner will generally conclude the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).

"Impairments that are controllable or amenable to treatment do not support a finding of disability." *Davidson v. Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) (**citing** *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997)). The same is true even where the symptoms may sometimes worsen, requiring adjustments in medication, as long as the impairment is generally controllable. *Davidson*, 578 F.3d at 846. Likewise, the absence of evidence of ongoing counseling or psychiatric treatment or of deterioration or change in the claimant's mental capabilities disfavors a finding of disability. **See** *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (concluding that a history of working with an alleged impairment, with no deterioration, was evidence that it was not severe). Even when doctors previously concluded that a claimant's mental impairment or depression was a major factor preventing a claimant from working, subsequent failure to treat, lack of deterioration and ongoing ability to function supports a finding the impairment is not severe. **See** *Gowell v. Apfel*, 242 F.3d 793, 797-98 (8th Cir. 2001); **see also** *Schultz v. Astrue*, 479 F.3d 979, 982-83 (8th Cir. 2007) ("Absent a showing of deterioration, working after the onset of an impairment is some evidence of an ability to work."). However, an ALJ should consider whether the claimant's failure to take medication or seek treatment is the result of a medically determinable symptom of the mental impairment rather than merely willful, justifiable, or unjustifiable noncompliance. **See** *Pate-Fires v. Astrue*, 564 F.3d 935, 945-47 (8th Cir. 2009); **see also** *Watkins v. Astrue*, No. 10–2590, 2011 WL 1166744, at *1 (8th Cir. Mar. 31, 2011) (unpublished); *Wildman v. Astrue*, 596 F.3d 959, 965-66 (8th Cir. 2010) (noting depression is distinguishable from schizoaffective disorder and absent evidence showing noncompliance linked to mental limitations, noncompliance with doctor's instructions is a valid reason for discrediting subjective complaints).

The ALJ has a duty to fully and fairly develop a record; however, the ALJ does not have to discuss every piece of evidence presented.  *Wildman*, 596 F.3d at 966. "Moreover, [a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Id.* (alteration in original) (**quoting** *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).  In the event, "the Appeals Council considers new evidence but denies review, [the court] must determine whether the ALJ's decision was supported by substantial evidence on the record as a whole, including the new evidence." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

The SSA recognizes two types of sources for evidence that may be used as evidence of an impairment or the severity of an impairment:  "acceptable medical sources" and "other sources."  **See** 20 C.F.R. § 404.1513.  As relevant here, an acceptable medical source is a licensed physician, which may be a medical or osteopathic doctor.  **See** 20 C.F.R. § 404.1513(a)(1).  Therapists and physician's assistants are listed under "other sources" and are not considered "acceptable medical sources."  20 C.F.R. § 404.1513(d)(1); **see also** *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005).  An "other source" opinion may by used to show the severity of an impairment, but may not be used to establish an impairment.  **See** 20 C.F.R. § 404.1513.

Under the regulations, the ALJ must determine the weight to give a particular source of testimony based on a set of criteria.  The ALJ stated the medical and opinion evidence was evaluated in accordance with the requirements of 20 C.F.R. §§ 404.1527 and Social Security Rulings (SSR) 96-2p, 96-5p, 96-6p, and 06-3p (AR. 18).  Under these requirements, the ALJ is to consider whether there was an examining or treating relationship; the length, frequency and nature of any treatment; whether the medical opinions are supported by objective and other evidence; the consistency of the medical opinion with the record as a whole; and the medical specialization of the doctor giving the opinion.  20 C.F.R. §404.1527(d); SSR 96-2p.

"A treating physician's medical opinion is given controlling weight if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Choate v. Barnhart*, 457 F.3d 865, 869 (8th Cir. 2006) (alteration in original) (**quoting** 20 C.F.R. §

404.1527(d)(2)); **see _Robson v. Astrue_, 526 F.3d 389, 393 (8th Cir. 2008)**.  An ALJ may discount a treating source's opinion if such opinion is inconsistent with the source's clinical treatment notes.  _Davidson_, 578 F.3d at 843.  "[The court] will uphold an ALJ's decision to discount or even disregard the opinion of a treating physician where 'other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'"  _Choate_, 457 F.3d at 869 (**quoting _Reed v. Barnhart_, 399 F.3d 917, 920-21 (8th Cir. 2005)**).  However, "[i]n determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record."  _Raney_, 396 F.3d at 1010 (**citing 20 C.F.R. § 416.927(d)(4)**).  Further, "a treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."  _Charles v. Barnhart_, 375 F.3d 777, 783 (8th Cir. 2004).  Specifically, the ALJ may discount medical opinions regarding limitations that are at odds with the same medical source's progress notes and unsupported by medically acceptable data.  **See _Halverson v. Astrue_, 600 F.3d 922, 929-30 (8th Cir. 2010)**.  Additionally, a treating source's statement that a claimant is "disabled" or "unable to work," does not carry "any special significance," for the Commissioner who makes the ultimate determination of disability.  _Davidson_, 578 F.3d at 842 (**citing 20 C.F.R. § 416.927(e)(1), (3)**).  The regulations require "that the [ALJ] will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), _i.e._, an opinion(s) on the nature and severity of an individual's impairment(s)."  SSR 96-2p; **see 20 C.F.R. §404.1527(d)(2)**.  Styskal disputes whether the ALJ properly considered Dr. O'Dell's opinions in accordance with SSR 96-2p.

Dr. O'Dell began treating Styskal by August 14, 2006 (AR. 217).  The record suggests Styskal appeared for follow-up treatment in the Rheumatology Clinic approximately once every six months and treated with Dr. O'Dell four times:  August 2006 (AR. 217-218), February 2007 (AR. 254-255), December 2007 (AR. 371-372), and December 2008 (AR. 466-467).  Dr. O'Dell provided his opinions in a form evaluation on March 18, 2008, after having seen Styskal on three occasions (AR. 401-406).

The ALJ noted Dr. O'Dell's treatment notes affirmed Styskal had "no joint activity or any other organ systems involved," with regard to SLE, on several occasions including December 12, 2007, and December 10, 2008, which opinion was echoed by Dr. Mahmoudi in a June 11, 2008, treatment note (AR. 20 (referencing AR. 372, 466, 471)).  Despite the finding, Dr. O'Dell gave his opinion, on March 18, 2008, that Styskal was limited to working six hours each day with at least three absences each month (AR. 20 (referencing AR. 405)).  And while Dr. O'Dell wrote, "It is important to note that physical limitations are not really the issue here, it is his mental cognitive function after his stroke that is," (AR. 406), testing by other sources estimated Styskal's cognitive intellectual abilities to be in the above average to superior range, with excellent short focused attention, and IQ scores above 100 (AR. 524-525) (AR. 19-20). Similarly, Dr. Diesing, a treating physician, indicated that on December 12, 2007, and June 10, 2008, Styskal's neurological examination was essentially normal (AR. 20 (referencing AR. 359, 445)).  Although Dr. Diesing noted Styskal's trouble with focus and short-term memory, Dr. Diesing observed Styskal's headaches were becoming less frequent and recommended medication to further decrease headache pain and cognitive symptoms (AR. 20 (referencing AR. 445-447)).  The ALJ specifically noted giving great weight to Mr. DeNell's findings which were supported by "significant detail [about] why claimant would be best limited to no less than light exertional-level work" (AR. 20 (referencing AR. 449-456)).

The ALJ wrote he

> does not give Dr. O'Dell's opinions great weight, since they are not fully supported by the evidence, and they are contradicted by treating source opinions and findings from Dr. Diesing and Mr. DeNell, for example.  As mentioned above, the [ALJ] finds that Dr. Diesing and the evaluation of the physical therapist Jake DeNell are the most accurate assessments.

(AR. 20).

In this case, the ALJ clearly took into consideration that Dr. O'Dell's was a treating relationship; the length, frequency and nature of the treatment; and whether the medical opinions were supported by objective and other evidence.  The ALJ relied, in particular, on the consistency of the medical opinion with the record as a whole and with Dr. O'Dell's own treatment notes.  Styskal generally argues the ALJ failed to acquiesce to Dr. O'Dell's opinions, and instead the ALJ made his own limitation findings without support in the

record.  Styskal argues the "ALJ just ignored the specific opinions of Dr. O'Dell" without actual contradictory opinions offered by Dr. Diesing or Mr. DeNell.  **See** Filing No. 22 - Brief p. 19.  However, Styskal fails to specify a particular recommendation or limitation opinion made by Dr. O'Dell that the ALJ erroneously ignored or for which he substituted his own "medical opinions."  Additionally, the ALJ properly explained his bases for discounting Dr. O'Dell's opinions that suggested Styskal would be unable to work full-time.

After evaluating Dr. O'Dell's opinions regarding Styskal's abilities, the ALJ determined the opinions were not entitled to weight because they were inconsistent with and unsupported by the medical evidence of record, including Dr. O'Dell's own treatment notes.  **See** *Halverson*, 600 F.3d at 929-30 (noting an ALJ may accord a treating physician's opinions less weight when they are inconsistent with the physician's clinical treatment notes and contrary to the medical evidence as a whole).  To the extent there is conflicting evidence in the record, the ALJ's determination that some of Dr. O'Dell's opinions were entitled to less weight as inconsistent with other medical evidence does not lie outside the available zone of choice.  **See** *Halverson*, 600 F.3d at 929-30; *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).  The ALJ noted the conflicting opinions regarding Styskal's ability to perform work activities and chose not to give controlling weight to Dr. O'Dell's opinion.  For example, although Dr. O'Dell marked on the form evaluation that Styskal suffered severe fatigue and malaise, such assessment is vague and contradicted by other medical evidence, including Styskal's own reports of improvement over time and conservative or lack of any treatment (AR. 402, 513, 520).  The records shows the ALJ properly considered evidence favorable to Styskal and explained his reasons for discounting that evidence, including reliance on more thorough opinions and other evidence.  **See** *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) (finding circumstances may exist where treating physician's opinion may be disregarded when compared to better or more thorough evaluations by one-time consultants).  Substantial evidence in the record as a whole supports the ALJ's decision.

**B.     Medical opinions of Dr. Christopher Milne and Dr. Linda Schmechel**

Styskal contends the ALJ failed to follow or properly discredit the opinions of either Dr. Milne or Dr. Schmechel, the DDS psychological consultants who examined the medical records and who provided opinions that Styskal was moderately limited in his ability to deal with many circumstances encountered in the work setting.  **See** Filing No. 22 - Brief p. 12.[3] Styskal argues the ALJ erred by not listing, discussing, or incorporating the opinions of either Dr. Milne or Dr. Schmechel into the findings, limitations, and hypothetical questions posted to the VE, in accordance with the requirements of SSR 96-6p.  **Id.** at 22.  However, Styskal asserts no issue exists as to his disabling condition because the VE testified all potential work would be eliminated given the limitations identified by Dr. Milne.  **Id.** at 23. In response, the Commissioner contends the ALJ, while not specifying the physicians by name, considered the opinions in evaluating Styskal's claim.  **See** Filing No. 27 - Response p. 18.  Moreover, the Commissioner states the ALJ expressly acknowledged both Dr. Milne and Dr. Schmechel's assessments.  **Id.** at 18-19.

Under the Social Security regulations, "[a person] can only be found disabled if [he is] unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment."   20 C.F.R. § 404.1527(a)(1) (alteration added).  Such "impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  **Id.**  Evidence obtained or submitted may contain "medical opinions," which "are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the] impairment(s)."  **Id.** § 404.1527(a)(2).

---

[3] Styskal makes several references to Dr. Schmechel's findings of "marked limitations," however the record does not support the reference.  Dr. Schmechel indicates no marked limitations, rather in several areas Dr. Schmechel checked the box indicating there is "no evidence of limitation in this category," which check box is next to the "marked limitation" check box.  **Compare** Filing No. 22 - Brief p. 7, 21, **with** AR. 411-412. The ALJ similarly referenced two findings of "marked limitations," but discounted them, finding they were inconsistent with Dr. Milne's assessment and did not result in Dr. Schmechel concluding there was a marked limitation in a broad area of mental functioning (AR. 17).  The ALJ's misunderstanding of Dr. Schmechel's assessment does not weaken, but rather strengthens the analysis showing the internal consistency of both Dr. Schmechel's actual assessment and the ALJ's variance with the perceived inconsistency.

23

Styskal's arguments relate to the ALJ's handling of two psychological consultants' assessments during step three of the five-step sequential evaluation process. In the course of the third step, the ALJ is to "consider the medical severity of [a claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant has an impairment that meets or equals one of the listings in appendix 1 and meets the duration requirement, a claimant is found to be disabled. *Id.* However, when the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's RFC based on all the relevant medical and other evidence in the case record. *Id.* § 404.1520(e). The RFC is then used at the fourth and fifth steps of the process, as described above. *Id.*

Styskal does not dispute the ALJ correctly determined his impairments do not meet or equal a listed impairment. Furthermore, Styskal acknowledges the ALJ followed SSR 96-6p, with respect to the two psychological consultants' assessments in that regard. **See** Filing No. 30 - Reply p. 3. SSR 96-6p provides:

> The administrative law judge or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled. As trier of the facts, an administrative law judge or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments. However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.

SSR 96-6p. The ruling further explains, "Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Id.*; **see** 20 C.F.R. § 404.1527(f)(2)(i)-(ii) (noting "Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant. . . .").

SSR 96-6p also applies to the RFC assessment as follows.

> Although the administrative law judge and the Appeals Council are responsible for assessing an individual's RFC at their respective levels of administrative review, the administrative law judge or Appeals Council must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists.  At the administrative law judge and Appeals Council levels, <u>RFC assessments by State agency medical or psychological consultants or other program physicians or psychologists are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s)</u>.  Again, they are to be evaluated considering all of the factors set out in the regulations for considering opinion evidence.

SSR 96-6p.

The ALJ analyzed Styskal's mental impairment, at step three, by explicitly recognizing both of the State Agency Mental Residual Functional Capacity Assessments and Psychiatric Review Technique forms completed by Dr. Milne and Dr. Schmechel (AR. 17).  Specifically, the ALJ agreed with the assessments such that they both found no difficulties in maintaining social functioning, no episodes of decompensation, and moderate limitations in maintaining concentration (AR. 17, 349, 426).  The ALJ explicitly stated his agreement with Dr. Milne's assessment finding Styskal has no restrictions of activities of daily living (AR. 349), rather than Dr. Schmechel's assessment finding Styskal had mild restrictions of activities of daily living (AR. 426), because there was no record evidence to indicate a mild limitation in that area of functioning, particularly where Mrs. Styskal stated Styskal had no problems performing personal grooming (AR. 17 (referencing AR. 150)).

Despite these conclusions, Styskal argues the ALJ erred in failing to adopt, discuss, or distinguish either Dr. Milne's or Dr. Schmechel's assessments in the section of the decision related to RFC.  **See** Filing No. 30 - Reply p. 3.  When determining the RFC, the ALJ limited Styskal to "jobs involving simple, routine tasks" (AR. 18).  Styskal argues this limitation does not equate to the list of moderate limitations from the consultants' assessments.  **See** Filing No. 30 - Reply p. 4.  Moreover, the ALJ failed to include these moderate limitations, as described by Dr. Milne and Dr. Schmechel in their assessments, when posing hypothetical questions to the VE.  **See** Filing No. 22 - Brief p. 21-22.  Styskal

represents that when the VE was asked the appropriate hypothetical question, the VE testified a person with moderate mental limitations, as indicated by Dr. Milne, could not perform work. *Id.* at 22. As suggested by Dr. Milne, the areas of moderate limitations at issue are the ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (5) respond appropriately to changes in the work setting (AR. 335-336). Dr. Schmechel also noted moderate limitations in the first three areas (AR. 411). However, Dr. Schmechel found no significant limitation in the fourth area and found no evidence of any limitation in the fifth area (AR. 411-412). Dr. Schmechel did note three other areas of moderate limitation in Styskal's ability to: (1) remember locations and work-like procedures, (2) understand and remember very short and simple instructions, and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (AR. 411-412).

The ALJ did not name or refer specifically to Dr. Milne's or Dr. Schmechel's assessments when determining Styskal's RFC, however the ALJ specifically distinguished Dr. Curran's nearly identical opinions that Styskal could not "carry out simple instructions under supervision" as generalized, conclusory, and extreme under the circumstances (AR. 20). The ALJ noted Syskal is "an intelligent and high achieving individual who has relatively mild memory impairment and relatively vague complaints of fatigue" (AR. 20), which were inconsistent with the one-time examiner's assessment. Additionally, the ALJ noted Dr. Gleason's January 2008 testing revealed that despite a weakness in sustained attention, Styskal showed above average reasoning skills, an excellent short focused concentration, and IQ scores over 100 (AR. 19-20). Finally, the ALJ noted Dr. Gleason's conclusion that medication use may help lesson Styskal's mental functional limitations (AR. 21).

The ALJ specifically states the RFC "reflects the degree of limitation the [ALJ] has found in the 'paragraph B' mental function analysis" and "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective

medical evidence" (AR. 18).  The ALJ expressly acknowledged both Dr. Milne's and Dr. Schmechel's assessments and how these assessment supported the ALJ determination that Styskal was limited to simple, routine tasks (AR. 17-18).  Additionally, the ALJ expressly considered and addressed the opinions about Styskal's abilities, limitations, and impairments.  A determination about the nature and severity of Styskal's impairments is reserved to the ALJ.  **See** 20 C.F.R. § 404.1527(e)(2) (stating "the final responsibility for deciding these issues is reserved to the Commissioner").  The ALJ included the relevant restrictions in his questions to the VE by including the limitation to jobs involving simple, routine tasks.  Under the circumstances presented, the ALJ adequately considered Dr. Milne's and Dr. Schmechel's assessments and explained his reasons for disagreeing with their conclusions which were contrary to the RFC determination.

## C.   Dr. Curran's Medical Opinion

"A single evaluation by a nontreating psychologist is generally not entitled to controlling weight."  *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011).  "ALJs are not obliged to defer to physician's medical opinions unless they are 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in the record.'"  *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (alteration in original) (**quoting** *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005)).  The reviewing court "will not reverse simply because some evidence may support the opposite conclusion."  *Pelkey*, 433 F.3d at 578.  The ALJ adequately considers a consultative psychologist's report where the ALJ resolves the differences between conflicting evidence in light of objective evidence and explains the reasoning for discounting the report's conclusions.  **See** *Dipple v. Astrue*, 601 F.3d 833, (8th Cir. 2010).

As noted above, the ALJ specifically discounted Dr. Curran's opinions that Styskal could not, for example, "carry out simple instructions under supervision" as generalized, conclusory, and extreme under the circumstances (AR. 20).  The ALJ highlighted Syskal's tested abilities which are contrary to Dr. Curran's findings.  The ALJ noted Dr. Curran's assessment was not entitled to great weight because of these conclusory statements and

inconsistencies with the record, and also because he was not a treating physician and appeared to be assessing why Styskal could not return to his past, more sophisticated work, rather than whether he had the ability to complete any work tasks, including simple ones (AR. 20-21).  Again, the ALJ expressly acknowledged Dr. Curran's opinions and provided reasons for how the ALJ considered and addressed the limitation and impairment opinions.  Under the circumstances presented, the ALJ adequately considered Dr. Curran's opinions and explained the reasoning behind his disagreement with those opinions, which were contrary to the RFC determination.

### D.    Claimant's credibility

Styskal argues the ALJ improperly applied the **_Polaski_** factors when evaluating Styskal's credibility regarding subjective allegations of his physical and mental conditions.  **See** Filing No. 22 - Brief p. 25-28 (**citing _Polaski v. Heckler_, 739 F.2d 1320, 1322 (8th Cir. 1984)**).  Styskal recognizes the ALJ listed the criteria for evaluating Styskal's testimony of subjective conditions and their limitations.  **See _Id._** at 25.  However, Styskal argues the ALJ did not make any findings as to Styskal's credibility.  **_Id._** at 25-26.  Styskal asserts the ALJ had no legitimate basis under **_Polaski_** to discredit Styskal's testimony.  **_Id._** at 28.

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility in addition to considering the medical evidence and the observations of physicians and others.  **_Willcockson v. Astrue_, 540 F.3d 878, 881 (8th Cir. 2008)**.  Normally, a court gives the ALJ deference in determining the credibility of a claimant's description of his or her limitations, where the credibility determination is supported in the decision.  **_McCoy v. Astrue_, 648 F.3d 605, (8th Cir. 2011)**.  In evaluating subjective complaints, an ALJ is to examine objective medical evidence in addition to the factors set forth in **_Polaski_**.  These factors include:  (1) the claimant's day to day activities; (2) the duration, intensity, and frequency of symptoms; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.  **_Polaski_, 739 F.2d at 1322**.

The ALJ applied the correct legal standard in evaluating Styskal's credibility as to his symptoms and the effect, if any, those symptoms have on his ability to function (AR.

18).  In determining whether Styskal's complaints are credible, the ALJ must give reasons for discrediting the allegations and explain any inconsistencies.  ***Buckner v. Astrue***, 646 F.3d 549, 558 (8th Cir. 2011) (affirming credibility assessment where although the ALJ did not explicitly cite ***Polaski***, he clearly considered the relevant factors).  In this instance, the ALJ acknowledged, citing 20 C.F.R. § 404.1529 (incorporating and expanding upon ***Polaski***); SSR 96-4p and 96-7p), that although Styskal's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [RFC] assessment" (AR. 18-19).  The ALJ specifically referenced several medical records, particularly those of Drs. Sundell and Diesing, noting "[t]hese treatment notes are examples of inconsistent evidence that are an indication that the claimant's functional limitations are not as severe as alleged" (AR. 19).  The ALJ also explicitly, and properly, relied on Styskal's current work and business activity as "some indication that his functional limitations are not as severe as alleged" (AR. 19).  See 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.");  ***Goff v. Barnhart***, 421 F.3d 785, 792 (8th Cir. 2005) (noting "[w]orking generally demonstrates an ability to perform a substantial gainful activity" and diminishes claimant's credibility).  Moreover, the ALJ specifically noted "there is no evidentiary support for [Styskal's] testimony that he is limited to working no more than a few hours per day or that he needs to lie down or nap during the day" (AR. 20).  Finally, the ALJ noted Drs. Gleason and Diesing recommended that Styskal try certain medications to lesson his mental function limitations (AR. 21).  Styskal refused recommended medications throughout his treatment, which is relevant to his credibility about disabling symptoms.  See 20 C.F.R. § 404.1530;  ***Wildman***, 596 F.3d at 965-66.  The ALJ did find Styskal credible to some extent as established by the ALJ expressly discounting certain other evidence, in part, because it did not adequately consider Styskal's subjective complaints (AR. 21).  The ALJ engaged in a thorough analysis of Styskal's testimony and discredited him, pursuant to the applicable and appropriate criteria.  Because the ALJ applied the correct legal standards, the court must take the ALJ's findings of fact as conclusive if supported by substantial

evidence on the record as a whole.  **See *Nettles*, 714 F.2d at 833**.  Styskal fails to specify any particular symptom or limitation, which he testified about and the ALJ ignored or discounted without making an explicit finding.  **Compare** Filing No. 22 - Brief p. 28 **with** AR. 18-21.  In this case, the ALJ properly evaluated Styskal's credibility based on evidence in the record, including medical examinations and testimony.  The record as a whole supports the ALJ's decision to discredit Styskal's testimony as to the severity of his symptoms.

## CONCLUSION

For the reasons stated above, the court concludes the ALJ's decision, which represents the final decision of the Commissioner of the SSA, should not be reversed or remanded.  The ALJ's decision does not contain the errors alleged by Styskal.  Specifically, substantial evidence in the record supports the ALJ's decision with regard to the weight accorded to the opinions of Drs. O'Dell, Milne, Schmechel, and Curran, Styskal's limitations, and Styskal's credibility.  Accordingly, the Commissioner's decision is affirmed.

**IT IS ORDERED:**

The Commissioner's decision is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

DATED this 29th day of September, 2011.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.